UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH CELLULAR TELEPHONE NUMBERS (207) 881-3818 AND (207)498-0325  THAT IS STORED AT PREMISES CONROLLED BY VERIZON WIRELESS | No.  1:21-mj-00268-JCN |

AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT

I, Bryan Klutzaritz, being first duly sworn, hereby depose and state as follows:

INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises owned, maintained, controlled, or operated by Verizon Wireless, a wireless provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey 07921. The information to be searched is described in the following paragraphs and in Attachment A.

2.      I am conducting an investigation into the drug trafficking activities of Sarah McBreairty, Jason Cunrod, John Miller, Daviston Jackson, Daquan Corbett a/k/a "Chinx," and others, who I believe have violated Title 21, United States Code, Sections 841(a)(1), 843, 846 and 856 and Title 18, United States Code, Sections 922, 924, and 371.

3.      This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Verizon Wireless to disclose to the government, records and other information in its possession pertaining to the subscribers or customers associated with the accounts, including the contents of communications over

1

telephone numbers (207) 881-3818 (hereinafter "Target Telephone" (TT10) and (207)498-0325 (hereinafter "Target Telephone" (TT11). As discussed below, there is probable cause to believe that TT10 is used by Sarah McBreairty and TT11 is used by Jason Cunrod in connection with the criminal offenses that I am investigating. TT10 is currently the subject of a pen register authorized by this court.

4. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I have been a Special Agent with the Drug Enforcement Administration ("DEA") since 2003 and I am presently assigned to the Bangor, Maine, office. I have received extensive training pertaining to narcotic investigations and the investigation of various crimes which arise from drug trafficking activities.

5. During my employment with DEA, I have participated in numerous investigations relating to the distribution of controlled substances, including methamphetamine, cocaine, heroin, diverted pharmaceuticals and other substances in violation of the federal anti-drug laws, including Title 21, United States Code, Sections 841 and 846. I have received training in the field of narcotics enforcement and investigations. I am familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the trafficking of illegal drugs.

6. The facts in this affidavit come from my personal observations, my training and experience, phone analysis, and information obtained from other agents, witnesses and other search warrants executed as part of this investigation. The showing of probable cause in this affidavit is further supported by the statements contained in prior search warrant affidavits that I executed in connection with this investigation.

7. This Court has jurisdiction to issue the requested warrant because it is "a court with jurisdiction over the offense under investigation." 18 U.S.C. § 2703(a).

## LEGAL AUTHORITY

8. The legal authority for this application is derived from 18 U.S.C. §§ 2701-11, which is commonly known as the "Stored Communications Act" or "SCA." Section 2703(a) provides in relevant part that:

> A governmental entity may require the disclosure by a provider of electronic communication service of the contents of a wire or electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation . . . .

18 U.S.C. § 2703(a).

9. Pursuant to 18 U.S.C. § 2703(b)(1), the government is permitted to apply for the equivalent of a search warrant without required notice to the subscriber. See 18 U.S.C. § 2703(b)(1)(A).

## FACTS SUPPORTING PROBABLE CAUSE

10. Throughout this investigation I have applied for and been granted multiple search warrants requesting content on multiple telephones being used by Sarah McBreairty. As a result of these warrants being executed, a large amount of evidence was uncovered within the text messages indicating McBreairty is involved in the distribution of large amounts of narcotics. In addition, Jason Cunrod has been identified as an associate of McBreairty distributing narcotics in Aroostook County. As discussed below, I have determined (207) 881-3818 (hereinafter TT10) is a telephone used by McBrearity and (207) 498-0325 (hereinafter TT11) is a telephone used by

Cunrod. As discussed in paragraph 15, below, I have determined that TT10 is McBreairty's telephone number based on some recent contact that she had with the Penobscot County Sheriff's Office. As indicated in paragraph 13, below, I have determined that TT11 is Cunrod's telephone number based on my review of certain car rental records. This determination is borne out by the context of various text messages discussed below.

11. On June 7, 2021, I participated in an interview with a Cooperating Defendant (CD1) in this investigation.[1] CD1 identified numerous people involved in McBreairty's illegal activity. CD1 told me that "Chinx" (Daquan Corbett) was McBreairty's source of supply for fentanyl and methamphetamine. CD1 identified Jason Cunrod as a person he would deliver large amounts of fentanyl and methamphetamine to on behalf of McBreairty. CD1 explained that he would make a large delivery to Cunrod and John Miller (The Indian) and the two would divide it up. CD1 would pick up cash from Cunrod and Miller to deliver to McBreairty. The most he recalled picking up from them for McBreairty was $80,000. CD1 also told me that McBreairty was obtaining firearms from Miller. CD1 delivered firearms from Miller to McBreairty.[2]

---

[1] CD1 is referred to in the masculine, without regardless of actual gender. CD1 provided this information in the presence of counsel and pursuant to the terms of a standard proffer agreement used by the U.S. Attorney's Office, which agreement conferred direct use immunity on all statements made by CD1. Although no promises were made to CD1, I believe that he provided the information in hopes of receiving leniency. CD1 subsequently signed standard plea and cooperation agreements with the USAO in which he agreed to plead guilty to a charge of possession with the intent to distribute controlled substances and a federal firearms charge. The cooperation agreement conferred direct and derivative use immunity on all information that CD1 provided.

[2] The information concerning Miller's involvement in firearms offenses and his criminal association with Sarah McBreairty is supported by the results of a federal search warrant issued by this Court for text message content over Miller's cellular telephone (TT9). See ¶16, infra. Within the text messages obtained from U.S. Cellular for TT9 were numerous drug related messages between McBreairty and Miller. Moreover, in a series of messages between TT9 and (207) 427-1621 on September 15, 2021 an individual tells Miller "Yeah I had a piece stolen a ruger 57x28 if u come across it pretty sure josh t grabbed it." The user of TT9 (in context, Miller) responded, "I know where it is if

12. On August 19, 2021, I applied for and was granted a search warrant by this court for a US Cellular telephone (207) 631-8475, hereafter referred to TT6, used by Sarah McBreairty. Within the information received from US Cellular upon execution of the warrant, several messages were identified with (617) 751-9942 subscribed to by Jalexis Ruiz of Roslindale, Massachusetts. Based on my knowledge of this investigation along with toll analysis of (617) 751-9942, I believe this number was used by Daquan Corbett, a/k/a "Chinx" at the time. On July 23, 2021, a series of messages were captured between TT6 and (617) 751-9942. At approximately 2:29 a.m., TT6 sent a message to (617) 751-9942, "Need up just fyi." At approximately 5:59 a.m., TT6 sent another message to (617)751-9942, "Are you guys close or can I go to sleep?" Shortly thereafter (617)751-9942 sent a message to TT6, "Don't fall into a deep sleep please." At approximately 6:05 p.m., TT6 responded, "Ok. My back doors open if I do, just cmon in hun." At approximately 7:34 a.m., TT6 sent a message to (617)751-9942, "Lmk when to clear my house… the boyfriend stopped in and a friend." Based on my involvement in this investigation, I know Corbett and his associates frequently go to McBreairty's residence to drop off narcotics. I believe this thread illustrates McBreairty waiting for their arrival. Subsequent messages indicated whomever was coming to the McBreairty residence did not arrive until later in the day. When McBreairty texts about clearing the house, she is telling Corbett she will have her boyfriend and the friend leave the residence. I know people involved in

---

you want to come over I'll tell you." Based on my training and experience and involvement in this investigation, I believe the user of (207)427-1621 was asking Miller if he knew the possible whereabouts of his Ruger pistol because of Miller's involvement in the trafficking of firearms. I believe because of Miller's involvement with firearms he was aware of the firearm's location as indicated in his response.

drug trafficking will limit their exposure by not having unnecessary witnesses to their activity. I believe McBreairty was limiting any people who may witness the arrival of Corbett or his associates.

13.  On July 23, 2021, at approximately 4:53 a.m., TT6 (McBreairty) sends a message to TT11 (Cunrod), "K I'll meet with ya in a bit. The boys should be here anytime." TT11 responds, "I was just coming to play cards and talk with you about the bank." At approximately 4:55 a.m., TT6 sends a message to TT11, "You know what I mean when I say the boys right." TT11 responds, "sure do." An administrative subpoena was sent to Verizon Wireless in an attempt to identify the subscriber of TT11. A return of the subpoena listed the subscriber as a TracFone. I caused an administrative subpoena to be sent to EAN Holdings (Enterprise, Alamo, National) rental car in attempt to identify the renter of a truck bearing Massachusetts license plate W31958 parked at McBreairty's residence of 91 First Street, Bangor, Maine in April 2021 during surveillance. EAN holdings identified the renter of the vehicle as Jason Cunrod who provided telephone number (207) 498-0325 (TT11) as his telephone number at the time of rental. I believe when McBreairty mentions the "boys" to Cunrod she is referring to Corbett and his associates coming to her residence as revealed in the text communication between TT6 and (617) 751-9942. When Cunrod responds "sure do" I believe this supports Cunrod being aware of McBreairty's activities and her narcotics source of supply.

14.  In August 2021, investigators identified a new residence purchased by Cunrod located at 1301 Moosehead Trail in Dixmont, Maine. During the aforementioned search warrant on TT6, a text conversation was identified between Cunrod and McBreairty in which McBreairty was discussing purchasing a residence with the assistance of Cunrod. Investigators learned

McBreairty was being evicted from 91 First Street in Bangor, Maine and was looking for a new place to live. I have spoken to the sellers of the Dixmont property who identified TT11 as the phone number that was used by Cunrod when inquiring about the residence. The sellers also identified Cunrod coming to view the property along with a female and another male who Cunrod identified as his son and his girlfriend. The sellers provided a physical description of the female who came to view the property. Based on the physical description given by the sellers, I believe the female was McBreairty. The male who Cunrod identified as his son is believed to be Joshua Jerrell based on the physical description provided by the sellers. Jerrell is a known boyfriend of McBreairty. Records obtained during the investigation indicated Cunrod purchased the residence with a cashier's check for $48,000.00 issued by TD Bank. I have reviewed TD Bank surveillance footage of Cunrod obtaining the check. Cunrod is observed bringing a large amount of U.S. Currency into the bank to acquire the cashier's check. I know people involved in drug trafficking will sometimes use cash drug proceeds to purchase assets in other people's names as a way to prevent law enforcement from identifying those assets. Based on the text messages identified on TT6 and the large amount of U.S. Currency to acquire the cashier's check, I believe McBreairty actually purchased the Dixmont property and supplied Cunrod with the U.S. Currency for the purchase.[3]

---

[3] During the course of the investigation I learned that in April 2021 Cunrod won $250,000 on a scratch lottery ticket, which paid out $174,953 after taxes. The Maine state lottery paid this out in a check that Cunrod deposited into his TD Bank account. As of July 8, 2021, Cunrod's account balance at TD Bank was approximately $32,467. Cunrod's account activity does not reveal a single $48,000 cash withdrawal that would explain where he obtained the $48,000 in cash he used to purchase the cashier's check. Between May and July 2021, there are multiple smaller cash withdrawals that add up to approximately $50,000. On October 7, 2021, a confidential witness (CW) told me that Cunrod told CW that he used lottery winnings to buy the property for McBreairty and that if she ever died or moved away, he (Cunrod) could keep the property. Based on my training and experience and the pattern of activity

15. On September 10, 2021, Sarah McBreairty called 911 for a domestic disturbance at 1301 Moosehead Trail in Dixmont, Maine. The Penobscot County Sheriff's Office responded to the scene. I have spoken to MDEA Special Agent (SA) Daniel Gastia who is also a Penobscot County Sheriff's Deputy. According to S/A Gastia, McBreairty called 911 from telephone number (207) 881-3818 (TT10).[4]

16. On September 21, 2021, I applied for and was granted a search warrant by this court for a US Cellular telephone number (207) 551-5267 (TT9) used by John Miller, a/k/a "The Indian." During a review of the information received from US Cellular, several messages were identified where Miller was discussing drug transactions and firearms. Subsequently, messages were identified between TT9 and TT11(Cunrod). On September 18, 2021, at approximately 5:27 p.m., TT11 sent a message to TT9, "Its j there was 49 in that stack." Based on my training and experience, I know people involved in drug trafficking refer to amounts of currency as "stacks." I believe Cunrod (who identifies himself as "j") was telling Miller there was $49,000.00 in U.S. Currency in the "stack" which I believe is from the sale of narcotics. Messages were also identified between TT10 (McBreairty) and TT9 during the execution of the warrant on TT9. On September 20, 2021, at approximately 8:19 p.m., TT10 sent a message to TT9, "You heard from

---

described above and Cunrod's involvement in drug trafficking with McBreairty – and notwithstanding what was reported to me by CW - I do not believe that the cash Cunrod brought to the bank came from lottery winnings. I believe that the cash represented drug proceeds. In addition, there are indications of Cunrod purchasing cashier's checks using funds in his account, as opposed to withdrawing cash and using it to buy a cashier's check.

[4] I have reviewed reports of this incident. In one it is reported that McBreairty was at the residence and had called to report that her ex-boyfriend, Joshua Jerrell, was at the residence and she wanted him to leave. By the time deputies arrived, Jerrell had already departed. In a second, it is reported that Cunrod also called to complain about Jerrell being at the residence. During the call, Cunrod stated that he had bought the property.

j?" TT9 responded, "yeah." At approximately 12:00 a.m. on September 21, 2021, TT9 sent another message to TT10, "When's he coming by." Based on my knowledge of this investigation, when McBreairty asked Miller if he heard from "J" she is referring to Cunrod. As previously discussed, I know from CD1 that Miller and Cunrod would split large amounts of fentanyl and methamphetamine delivered to Aroostook County by CD1. In addition, CD1 recalled picking up at least $80,000.00 for McBreairty from Cunrod and Miller on one occasion. I believe these messages between McBreairty, Cunrod and Miller corroborate the information provided by CD1 that Miller and Cunrod sell narcotics on behalf of McBreairty and were referring to the collection of drug proceeds.

17. I have conducted toll analysis of both TT10 and TT11. Concerning TT10, from August 22, 2021, to October 4, 2021, there were approximately 3,955 total contacts over TT10 with approximately 2,752 of those contacts in the form of text messages. TT10 had approximately 21 total contacts with TT9 with approximately 11 of those contacts in the form of text messages. TT10 was in contact with TT11 approximately 69 times with approximately 63 of those contacts in the form of text messages. TT10 also had approximately 75 contacts with (207) 710-9369 with approximately 60 of those contacts in the form of text messages. Telephone (207) 710-9369 is subscribed to Peter Veret, whom I believe to be Pierre "Peter" Verrett based on information obtained from a search warrant executed in this investigation. On September 3, 2021, Verrett was arrested by members of the Presque Isle PD for Unlawful Possession of Methamphetamine after a small amount of methamphetamine was found in a vehicle he was occupying. Recent toll analysis of (207) 710-9369 also revealed contact with TT11, TT9 and (207) 806-6099. Telephone (207) 806-6099 is a number which was identified as being used by

Corbett in the later part of 2020. The phone was not used for some time and became active again communicating with (207) 710-9369 from September 6, 2021, to September 19, 2021, with approximately 47 total contacts.

    18.    I have conducted toll analysis of TT11 from July 28, 2021, to September 28, 2021. During the analyzed time frame, there were approximately 8,662 total contacts over TT11 with approximately 5,302 of those contacts in the form of text messages. Toll analysis revealed approximately 125 total contacts with TT9 with approximately 94 of those contacts in the form of text messages. TT11 was also in contact with (207) 710-9369 (Veret) approximately 193 times with approximately 157 of those contacts in the form of text messages. TT11 was also in contact with TT10 as described in paragraph 16.

FURTHER BACKGROUND AND TRAINING AND EXPERIENCE OF AFFIANT

    19.    Based on my training and experience, and conversations with other law enforcement agents who have conducted controlled substance investigations, I know the following:

    a. Distributors of controlled substances often communicate with their co-conspirators using cellular phones and often use multiple cellular telephones to compartmentalize their operations or to avoid detection by law enforcement;

    b. Distributors of controlled substances frequently use these cellular telephones to not only engage in voice communications, but also to send text messages, emails, and digital photographs to their co-conspirators in furtherance of their drug trafficking activity;

    c.    Text messages are sent to and received from not only known drug associates, but also friends, family members and associates of the drug trafficker who are criminally involved or, at a minimum, are potential witnesses relevant to my investigation to include witnesses as to the identity and location of suspected conspirators, location of assets, and location of residences frequented by suspected conspirators; and

    d.    The high volume of text messages over TT10 and TT11, when viewed in conjunction with the other evidence summarized above, is consistent with the use of the TT10 and TT11 to send and receive drug related text messages.

20. Based on my training and experience, I have learned that Verizon Wireless is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and un-retrieved voicemail, text, and multimedia messages for Verizon Wireless subscribers may be located on the computers of Verizon Wireless. Further, I am aware that computers located at Verizon Wireless contain information and other stored electronic communications belonging to unrelated third parties.

21. Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail. If the subscriber does not delete the message, the message may remain in the system of Verizon Wireless for weeks or months.

22. Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more

wireless providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging" or "wireless messaging."

23. Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

24. Many wireless providers retain information about the location in which a particular communication was transmitted or received. This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

25. Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the

embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

26. Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifiers for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates and times of payments and the means and source of payment (including any credit card or bank account number).

27. In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support

services, as well as records of any actions taken by the provider or user as a result of the communications.

## METHODS TO BE USED TO EXECUTE SEARCH

28.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Verizon Wireless to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

29.     Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the computer systems in the control of Verizon Wireless there exists evidence of a crime, specifically, narcotics trafficking offenses in violation Title 21, United States Code, Sections 841(a)(1), 843, 846 and 856 and firearms offenses in violation of Title 18, United States Code, Sections 922, 924, and conspiracy to commit the same firearms offenses in violation of Title 18, United States Code, Section 371, by Sarah McBreairty,

Jason Cunrod, John Miller A/K/A "The Indian", Daviston Jackson, Daquan Corbett, a/k/a "Chinx or Chinks," and others. Accordingly, a search warrant is requested.

Bryan Klutzaritz
Special Agent
United States Drug Enforcement Administration

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedure

Date: Oct 13 2021

City and state: Bangor, ME

John C Nivison U.S. Magistrate Judge
Printed name and title

15